Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2716 | **DATE** | 10/09/2001 |
| **CASE TITLE** | Amwest Surety Insurance Company vs. Frank Szabo, Jr., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 10/19/2001 at 10:00 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum opinion and order. Plaintiff's motion for summary judgment [29-1] is granted in part and denied in part.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 11 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | FOR DOCKETING 01 OCT 10 AM 9:37 | 10/9/2001 date mailed notice | |
| IS | courtroom deputy's initials | Date/time received in central Clerk's Office | IS mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMWEST SURETY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) Case No. 00 C 2716 ) |
| v. | ) Magistrate Judge ) Martin C. Ashman |
| FRANK SZABO, JR. and SZABO CONSTRUCTION SERVICES, INC., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Amwest Surety Insurance Company filed suit against Frank Szabo and Szabo Construction Services, Inc. ("SCSI") to recover funds and collect collateral pursuant to a General Indemnity Agreement (the "Indemnity Agreement") and an Agreement/Loan/Trust Account (the "Execution Agreement") for expenses it incurred and for protection against expenses it might incur as a result of issuing surety bonds for Szabo Contracting, Inc. The complaint included counts for contractual indemnity, specific performance, and breach of contract.

Presently before this Court is Amwest's Motion for Summary Judgment as to liability on all counts contained in the complaint. For the following reasons, this Court grants Amwest's Motion for Summary Judgment in part and denies it in part.[1]

DOCKETED
OCT 1 1 2001

---

[1] The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).



## I. Background

Amwest and Szabo crossed paths in 1999 in connection with construction work that Szabo Contracting agreed to perform for four public entities.[2] Amwest was in the business of providing surety bonds to construction companies. To contract with the public entities to perform construction work, Szabo Contracting needed Amwest to provide surety bonds to secure Szabo Contracting's contractual obligations.

In consideration of the issuance of the surety bonds by Amwest on behalf of Szabo Contracting, Szabo Contracting and Amwest entered into an Indemnity Agreement on April 6, 1999. Among other things, the Indemnity Agreement required Szabo Contracting to "indemnify and hold [Amwest] harmless from and against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses of whatever kind or nature" that might arise by reason of Amwest's execution of the bonds on behalf of Szabo Contracting. (Pl.'s Rule 56.1 Statement of Material Facts Ex. A at 9.) The liability of Szabo Contracting extended to and included "all amounts paid by [Amwest] in good faith under the belief that [Szabo Contracting] was in Default" as per the Indemnity Agreement. (*Id.*) A default included an event where Szabo Contracting became the subject of any assignment for creditors or where Szabo Contracting breached any provision of the Indemnity Agreement. (*Id.*)

Upon default, Amwest could employ a variety of remedies such as taking over any construction contract and arranging for its completion. (*Id.* at 10.) To protect itself from any

---

[2] The facts listed herein are either uncontroverted or narrated in the light most favorable to Szabo and SCSI, the nonmoving parties. Only facts submitted in accordance with Local Rule 56.1 are included. Therefore, because replies to Local Rule 56.1(b)(3)(A) responses are not permitted by Local Rule 56.1(a), this Court disregards Amwest's reply to Szabo and SCSI's Local Rule 56.1(b)(3)(A) response.

claims arising from a default, Amwest could require Szabo Contracting to post cash or other property as collateral, if Amwest deemed it necessary. Furthermore, if Amwest determined that events caused the posted collateral to become insufficient, then Amwest could demand additional or substitute collateral from Szabo Contracting in an amount or type acceptable to Amwest.

Seeing that Szabo, as President of Szabo Contracting, signed the Indemnity Agreement, Szabo Contracting was liable under the Indemnity Agreement, and, as per the Indemnity Agreement, so too were Szabo Contracting's successors in interest. (Pl.'s Rule 56.1 Statement of Material Facts Ex. A at 9.) Additionally, Szabo himself was liable under the Indemnity Agreement, for he signed the Indemnity Agreement in an individual capacity. The total amount of potential liability assumed by Szabo and Szabo Contracting was approximately $4,725,075.83, the value of the bonds issued by Amwest in reliance on the terms of the Indemnity Agreement.

In October 1999, the weight of Szabo Contracting's debts became too much for it to bear, and, as a result, Szabo Contracting elected to make an assignment for the benefit of creditors. By reason of that assignment, and because of its financial condition, Szabo Contracting advised Amwest and notified certain of the four public entities (who were obligees under the bonds issued by Amwest) that Szabo Contracting would be unable to perform its obligations under the construction contracts, thereby placing Szabo Contracting in default of those obligations and causing Amwest to take over the construction contracts to arrange for their completion.

Around the same time as the assignment took place, Szabo formed SCSI. Upon formation of SCSI, Szabo, acting as President of SCSI, proposed to Amwest that SCSI could complete the construction work that Szabo Contracting started to perform, possibly for less money than other construction companies since Szabo was already familiar with the work.

Discussions led to Amwest accepting Szabo's proposition and to the signing of an Execution Agreement by Szabo, SCSI, and Amwest on October 15, 1999. The Execution Agreement listed the four construction contracts under which Szabo Contracting had agreed to perform, and for which Amwest had issued the bonds, and it explained the state of affairs—i.e., Szabo Contracting could not perform its obligations under the construction contracts and Amwest had agreed to complete the construction contracts using SCSI. The Execution Agreement then stated that Szabo, as President of SCSI and in his individual capacity, acknowledged execution of the Indemnity Agreement in favor of Amwest and that, by executing the Execution Agreement, Szabo, as President of SCSI and in his individual capacity, affirmed the obligations undertaken by him and Szabo Contracting pursuant to the Indemnity Agreement. Finally, the Execution Agreement declared that, by executing the Execution Agreement, Szabo and SCSI each agreed to "execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects."[3] (Pl.'s Rule 56.1 Statement of Material Facts Ex. H at 4.)

SCSI commenced performance on the construction projects, but that performance did not last long. During the course of the work, two disputes arose between Amwest and Szabo: one dealing with certain billings submitted by SCSI, which Amwest believed were improper; and the other dealing with the withholding of payments by Amwest to SCSI for its work, which SCSI

---

[3] The parties also entered into a written or an oral contract requiring SCSI to complete the remaining work on the construction contracts at IDOT Force Account rates—i.e., on a time and material basis at rates determined by the Illinois Department of Transportation. (Pl.'s Rule 56.1(a)(3) Response ¶¶ 35-38.)

contended was in violation of an understanding between the parties. *See supra* note 3. One thing led to another, and eventually SCSI demobilized its forces and ceased performance on the projects. But before doing so, SCSI asserted liens against the funds held by the public entities pursuant to 770 ILCS § 60/23 in the amount of $1,168, 593.75. Amwest again found itself in the position of arranging for the completion of the construction contracts.

To complete the construction contracts, Amwest determined that it would need to spend approximately $600,000 over the contract amounts held and to be paid by the obligees. (In other words, assuming Amwest obtained reimbursement from the contract funds held by the obligees, Amwest would lose approximately $600,000 on the construction contracts.) Therefore, around April 2000, Amwest made demand on Szabo and SCSI under the Indemnity Agreement and Execution Agreement to pay Amwest the amounts it had incurred in losses thus far and to post collateral to protect Amwest against potential claims. Both Szabo and SCSI refused to accede to the demand, so Amwest filed a complaint in federal court.

The complaint contained three counts: breach of the Indemnity Agreement and Execution Agreement, specific performance of the collateral posting provision of the Indemnity Agreement, and breach of a contract that required SCSI to complete the remaining construction work at IDOT Force Account rates. The complaint sought pecuniary damages, the posting of collateral, and the release of liens.

Szabo and SCSI responded to the complaint with several defenses—e.g., that Amwest could not enforce the Indemnity Agreement and Execution Agreement against SCSI—and by asserting three affirmative defenses: failure to mitigate damages, equitable estoppel, and breach of the covenant of good faith and fair dealing.

After the close of discovery, Amwest filed the instant Motion for Summary Judgment, which seeks to establish the liability of Szabo and SCSI as to all counts contained in the complaint. We now address the parties' positions on the issues raised in the motion.

## II. <u>Discussion</u>

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact that may affect the outcome of a claim under the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue as to a material fact exists if, construing all of the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999); *Jackson v. Chi. Firefighters Union Local #2*, 99 C 1651, 2001 WL 726992, at *5 (N.D. Ill. June 27, 2001) (quoting *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990)).

In terms of procedure, the moving party bears the initial burden of establishing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Assuming the burden is met, the nonmoving party must set forth specific facts demonstrating the existence of a genuine issue of material fact—i.e., specific facts to demonstrate that the case should go

before a jury. Fed. R. Civ. P. 56(c). If the nonmoving party fails to meet the burden, then summary judgment must be entered in the moving party's favor.

Even if the moving party seeks summary judgment on issues where the nonmoving party bears the initial burden of proof at trial, the same procedural rules apply. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978-79 (7th Cir. 1996); *Russ v. Int'l Paper Co.*, 943 F.2d 589, 591-92 (5th Cir. 1991); *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 WL 786388, at *1-2 (N.D. Ill. Nov. 6, 1998). Thus, a moving party cannot simply ignore an affirmative defense; it must initially demonstrate the lack of a genuine issue of material fact as to that defense. *Id.*

### B. Contractual Indemnity

In Illinois,[4] courts treat indemnity agreements the same as other contracts, and therefore, general principles of contract law apply. *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 743 (7th Cir. 1996) (citing *Charter Bank v. Eckert*, 585 N.E.2d 1304, 1310 (Ill. App. Ct. 1992). As SCSI's initial challenge to Amwest's motion involves the enforceability of the Execution Agreement—particularly, whether the Execution Agreement is binding on SCSI due to the fact that SCSI purportedly never received a signed copy of the Execution Agreement from Amwest—we begin our discussion by reciting the traditional elements for contract formation under Illinois law: offer, acceptance, and consideration. *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987).

---

[4] Since neither party raised a conflict of law issue in this diversity case, we apply Illinois law. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991); *Aetna Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Chi.*, 956 F. Supp. 814, 817-18 (N.D. Ill. 1997).

We surmise that SCSI's argument, which consists of one sentence and no citations to case law, goes toward the second element—acceptance. That is, acceptance of the Execution Agreement was conditional on SCSI's receipt of a copy of the signed agreement.

Plainly, SCSI's argument is untenable. Nowhere in the Execution Agreement does it state that acceptance is conditional on SCSI's receipt of a signed copy of the Execution Agreement. *See Heritage Commons Partners v. Vill. of Summit*, 935 F.2d 1489, 1494 (7th Cir. 1991) ("Illinois law recognizes that the assent to the terms of an agreement will constitute the acceptance of a contract unless the party 'expressly [makes acceptance] conditional on assent to the additional or different terms.'" (quoting *McCarty v. Verson Allsteel Press Co.*, 411 N.E.2d 936, 945 (Ill. App. Ct. 1980))). Therefore, considering that Amwest, Szabo, and SCSI have all signed the Execution Agreement, and that no issue has been raised as to the consideration underlying the Execution Agreement, we find that the Execution Agreement is enforceable against both Szabo and SCSI.

Moving on, we next determine SCSI's and Szabo's obligations under the Execution Agreement. Under Illinois law, the starting point of contract analysis is the language of the contract itself. *United States v. 4500 Audek Model Number 5601 AM/FM Clock Radios*, 220 F.3d 539, 542 (7th Cir. 2000); *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996). If the language of the contract unambiguously provides an answer to the question at issue, then the court's analysis ends. *Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 456 (7th Cir. 1991). On the other hand, if the pertinent language of the contract is ambiguous, then the court must go on to declare the contract's meaning. *Id.*

The central provisions of the Execution Agreement in this case are as follows:

> As President of . . . [SCSI], Frank Szabo, both in his capacity as President and as an individual indemnitor, acknowledges execution of the [Indemnity Agreement] in favor of Amwest which was given in consideration of the execution of the . . . bonds.
>
> By execution of [the Execution Agreement], Frank Szabo as President of . . . [SCSI] and individually affirms the obligations undertaken by him . . . pursuant to the [Indemnity Agreement]. By execution of [the Exeuction Agreement], [SCSI] and Frank Szabo individually agree to execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects.

(Pl.'s Rule 56.1 Statement of Material Facts Ex. H at 3-4.) To "acknowledge" means to admit the existence of, and to "affirm" means to declare or maintain to be true. Webster's II New Riverside University Dictionary 74, 83 (1994). Thus, neither the acknowledgment nor the affirmation provisions obligated Szabo and SCSI to do anything, and the only obligation that Szabo and SCSI incurred by way of these provisions of the Execution Agreement was the obligation to "execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects."[5] (Pl.'s Rule 56.1 Statement of Material Facts Ex. H at 4.)

As for the Indemnity Agreement, the only other contract before us, the question framed by the parties is, Who is liable under it? Given that Szabo signed the Indemnity Agreement in an individual capacity, and there being no issue as to the enforceability of the Indemnity Agreement, we find that Szabo is liable in an individual capacity under the Indemnity Agreement.

---

[5] For clarification, nothing in this decision should be construed as a finding as to the scope or enforceability of this obligation.

Amwest suggests that SCSI is also liable under the Indemnity Agreement, not because of its signing the Indemnity Agreement, but because of its being a successor to or joint venture of Szabo Contracting,[6] which was a signatory to the Indemnity Agreement. As mentioned in the background section, the Indemnity Agreement does state that a successor of or joint venture to Szabo Contracting is bound to the terms of the Indemnity Agreement. *See supra* p. 3.

Successor, when used in the context of corporate law, means "another corporation which, through amalgamation, consolidation, or duly authorized legal succession, has acquired the rights and assumed the burdens of the initial corporation." *AA Sales & Assocs., Inc. v. JT & T Prods. Corp.*, No. 98 C 7954, 2000 WL 1557940, at *2 (N.D. Ill. Oct. 19, 2000) (quoting *Toepper v. Brookwood Country Club Road Ass'n*, 561 N.E.2d 1281, 1285-86 (Ill. App. Ct. 1990); Black's Law Dictionary 1431 (6th ed. 1990) (With reference to corporations, successor "generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with [the] rights and assumes [the] burdens of [the] first corporation."). Put another way, a successor corporation is a corporation that consumes or absorbs another corporation—its business, its assets, its rights, and its liabilities. *AA Sales & Assocs., Inc.*, 2000 WL 1557940, at *2.

As evidence that SCSI is the successor to Szabo Contracting, Amwest mentions that Szabo formed and managed both entities, that SCSI offered to complete the work of Szabo Contracting under the construction contracts, and that Szabo himself represented to the Village of

---

[6] In its briefs, Amwest stated that "SCSI is . . . a joint venture between Szabo Contracting and SCSI." (Pl.'s Mot. Summ. J. at 9.) Because it defies logic to say that SCSI joined with Szabo Contracting to form SCSI, we consider Amwest's argument to be that Szabo Contracting and another entity formed SCSI.

Glen Ellyn in a letter that Szabo Contracting changed its name to SCSI. (Pl.'s Rule 56.1(a)(3) Response ¶ 32.) Szabo and SCSI admit the first two facts; the only matter in dispute concerns the letter, and we understand why.

The letter stated: "I am writing to inform the Village of Glen Ellyn that Szabo Contracting, Inc. has officially changed [its] name to Szabo Construction Corp., effective October 13, 1999." (Pl.'s Rule 56.1 Statement of Material Facts Ex. F.) How Amwest can rely on the words in this letter to show that SCSI is a successor to Szabo Contracting is left to the imagination. SCSI is not mentioned in the letter. Furthermore, Amwest has presented no evidence demonstrating that SCSI and Szabo Construction Corp. were one and the same.[7] Accordingly, the letter does nothing in the way of establishing successor liability.

That leaves Amwest with evidence that is wholly inadequate to establish successor liability on the part of SCSI. Common ownership and what could be argued as suspicious timing may be necessary to establish successor liability in the context of corporate law, but they do not establish it. *See AA Sales & Assocs., Inc.*, 2000 WL 1557940, at *2; *Steel Co. v. Morgan Marshall Indus., Inc.*, 662 N.E.2d 595, 599-600 (Ill. App. Ct. 1996). Therefore, we hold that, for purposes of this motion, SCSI is not the successor to Szabo Contracting.

In terms of SCSI being a joint venture of Szabo Contracting, we reach the same conclusion. A joint venture is an association of two or more parties to carry on a single enterprise for profit. *Indus. Hard Chrome, Ltd. v. Hetran, Inc.*, 90 F. Supp. 2d 952, 955 (N.D. Ill.

---

[7] Most frustrating is the fact that Amwest has repeatedly misrepresented the letter to this Court by substituting SCSI for Szabo Construction Corp. (*See* Pl.'s Mem. Supp. Mot. Summ. J. at 10; Pl.'s Rule 56.1(a)(3) Response ¶ 32; Pl.'s Reply Mem. Supp. Mot. Summ. J. at 5.) This conduct is reprehensible.

2000). To establish the existence of a joint venture under Illinois law, a plaintiff must present evidence of an agreement between at least two parties to carry on an enterprise, with a common interest in that enterprise, an expectation of profits, a duty to share profits and losses, and the right of each party to the agreement to govern the conduct of the other parties. *Id.* (citing *Fomusa v. Permian Petroleum Co.*, No. 96 C 50410, 1997 WL 792983, at *2 (N.D. Ill. Dec. 16, 1997)).

Briefly, Amwest has presented no evidence as to any type of agreement between Szabo Contracting and some other party to carry on SCSI for profit. Therefore, we find that Amwest has not established that SCSI was the joint venture of Szabo Contracting as a matter of law.

In sum, we hold that only Szabo is liable under the Indemnity Agreement, considering that SCSI never signed the Indemnity Agreement and that SCSI is not a successor to or joint venture of Szabo Contracting. As per the Execution Agreement, Szabo and SCSI do have an obligation to execute certain agreements, as discussed above.

### C. Defenses to Contractual Indemnity

Szabo and SCSI assert three defenses to any obligations they may otherwise have under the Indemnity Agreement and Execution Agreement. These defenses are failure to mitigate damages, equitable estoppel, and breach of the covenant of good faith and fair dealing. As this decision (and thus the evidence presented so far) only relates to liability, not damages, Szabo's and SCSI's failure to mitigate damages defenses are misplaced. We will determine the merits of those defenses on another day. *See Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1402 (7th Cir.

1991); *Grassi v. N.Y. Life Ins. Co.*, No. 86 Civ. 8256 (RJW), 1992 WL 249936, at *11 (S.D.N.Y. Sept. 24, 1992).

Szabo's and SCSI's equitable estoppel defenses, on the other hand, can be dismissed at this instant. To establish equitable estoppel in Illinois, a party must show that (1) the party against whom the estoppel is asserted misrepresented or concealed material facts, (2) with knowledge that the representations were false or with gross negligence as to their truth, (3) that the party asserting the estoppel had no knowledge of the truth of the representations at the time he acted upon them, (4) that the party against whom the estoppel is asserted intended or reasonably expected the representations or concealment to be acted upon, (5) that the party asserting the estoppel relied on the representation in good faith to his detriment, and (6) that the party asserting the estoppel would be prejudiced if the other party is not estopped. *Vaughn v. Speaker*, 533 N.E.2d 885, 890 (Ill. 1988). The doctrine aims to prevent fraud and injustice. *Gorgees v. Daley*, 628 N.E.2d 721, 725 (Ill. App. Ct. 1993).

Szabo and SCSI's argument in support of equitable estoppel goes as follows: Since Amwest required SCSI to complete the construction work started by Szabo Contracting on a time and material basis (instead of some other basis), and that requirement caused Amwest to lose money under the contracts (and thereby seek indemnification), Amwest should be estopped from recovering funds from Szabo or SCSI by way of indemnification. Otherwise stated, Amwest's poor business judgment should not be the demise of Szabo and SCSI.

Setting aside the issue of Amwest's business judgment, which may not be poor after all,[8] the flaw of Szabo and SCSI's argument is that it contains no allegation of misrepresentation or concealment. In the absence of specific facts of misrepresentation or concealment, a defense of equitable estoppel cannot withstand summary judgment. *Indus. Specialty Chems. v. Cummins Engine Co.*, 918 F. Supp. 1173, 1179 (N.D. Ill. 1996). Thus, Szabo's and SCSI's equitable estoppel defenses must fall.

The covenant of good faith and fair dealing, which constitutes Szabo's and SCSI's final defenses, is contained in every contract by operation of Illinois law. *N. Trust Co. v. VIII S. Mich. Assocs.*, 657 N.E.2d 1095, 1104 (Ill. App. Ct. 1995); *Continental Mobile Tel. Co.*, 587 N.E.2d 1169, 1174 (Ill. App. Ct. 1992). The covenant aids in determining the intent of the parties where a contract is susceptible to two conflicting constructions. *N. Trust Co.*, 657 N.E.2d at 1104. Ordinarily, the covenant becomes an issue where one party to a contract is given broad discretion in performance. *Id.* In that situation, the covenant requires the party vested with discretion to exercise his discretion reasonably and in a manner consistent with the reasonable expectations of the parties at the time they entered into the contract. *Continental Mobile Tel. Co.*, 587 N.E.2d at 1174.

Szabo contends that Amwest breached its covenant of good faith and fair dealing under the Indemnity Agreement by arranging to have the construction contracts completed on a time and material basis. The language of the Indemnity Agreement invests Amwest with "sole

---

[8] By contracting with SCSI to have the remaining construction work done on a time and material basis, Amwest put itself in a position to take in as profit the difference between the contract balances due and the cost of paying SCSI on a time and material basis. (Tr. Oral Argument 5/31/01 at 5-7.)

discretion" to "[t]ake over any Contract and arrange for its completion, utilizing either the Principal's current or any other subcontractors and material suppliers as [Amwest] may select." (Pl.'s Rule 56.1 Statement of Material Facts Ex. A at 10.) This broad discretion, in our opinion, evinces that the covenant of good faith and fair dealing binds Amwest's actions in relation to Szabo, the indemnitor, to some degree. At a minimum, we believe that Amwest's decision of whom to contract with to complete any contracts, in terms of cost, must have a reasonable basis.

Based on the evidence presented by Szabo, we find that Amwest exercised its discretion reasonably as a matter of law. Amwest's decision to select SCSI was reasonable because Szabo was familiar with the work, and Amwest's decision to finish the work at IDOT Force Account rates was reasonable because it brought with it the likelihood that Amwest could obtain a benefit (more profit) at no expense to Szabo. *See supra* note 8.

As it turned out, Amwest lost on its gamble, but, because Szabo has presented no facts to show that the decision to take that gamble was arbitrary, capricious, or inconsistent with the reasonable expectations of the parties at the time the Indemnity Agreement was executed, we must grant summary judgment in Amwest's favor. In short, we find no justification for reading a provision into the Indemnity Agreement that would preclude Amwest from entering into time and material contracts upon notice of a default. *See N. Trust Co.*, 657 N.E.2d at 1104 ("The covenant of good faith and fair dealing does not enable a guarantor to read an obligation into a contract that does not exist.").

With respect to the Execution Agreement, SCSI suggests, in a single sentence without any citations, that Amwest breached its covenant of good faith and fair dealing. (Defs.' Resp. Pl.'s Mot. Summ. J. at 10.) Because this argument is perfunctory and undeveloped—indeed,

SCSI even fails to cite a provision of the Execution Agreement—we reject it. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."); *Anderson v. Hale*, No. 00 C 2021, 2001 WL 417991, at *11 n.6 (N.D. Ill. Apr. 23, 2001) (same). As a court, we resolve arguments, we don't make them.

### D. Specific Performance and Breach of Contract

In cursory fashion, we deny Amwest's Motion for Summary Judgment as to liability on counts two and three.[9] Neither count two nor three has been adequately addressed and argued by Amwest in the briefs. Additionally, Amwest's Local Rule 56.1 submissions do not contain sufficient facts to enable this Court to make a decision on count two or three in Amwest's favor.

### III. Conclusion

For the reasons stated, this Court grants Amwest's Motion for Summary Judgment in part and denies it in part. Szabo is bound by the terms of the Indemnity Agreement, and both Szabo and SCSI are bound by the terms of the Execution Agreement.

**ENTER ORDER:**

_____
MARTIN C. ASHMAN
United States Magistrate Judge

Dated: October 9, 2001.

---

[9] Presumably Amwest asked this Court to make a liability finding on count two by mistake. (*See* Pl.'s Mot. Summ. J. at 1 (asking this Court for a liability finding on "all Counts of Plaintiff's Complaint").) Specific performance is a remedy, not a basis of liability.

Copies have been mailed to:

| | |
|---|---|
| T. SCOTT LEO, Esq.<br>GRACE WINKLER CRANLEY, Esq.<br>Leo & Webber, P.C.<br>One North LaSalle Street<br>Suite 3600<br>Chicago, IL 60602<br><br>Attorneys for Plaintiff | JAMES M. DASH, Esq.<br>BARBARA A. GIMBEL, Esq.<br>Rosenthal and Schanfield, P.C.<br>55 East Monroe Street<br>46th Floor<br>Chicago, IL 60603<br><br>Attorneys for Defendants |