Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2716 | **DATE** | 7/15/2002 |
| **CASE TITLE** | Amwest Surety Insurance Company vs. Frank Szabo, Jr., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter memorandum opinion and order. Plaintiff's motion for summary judgment [50-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 16 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | | 7/15/2002 date mailed notice | |
| IS | courtroom deputy's initials | 02 JUL 15 PM 4:01 Date/time received in central Clerk's Office | IS mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMWEST SURETY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 00 C 2716 |
| v. | ) ) ) | Magistrate Judge Martin C. Ashman |
| FRANK SZABO, JR. and SZABO CONSTRUCTION SERVICES, INC., | ) ) ) | |
| Defendants. | ) | |

DOCKETED
JUN 1 6 2002

## MEMORANDUM OPINION AND ORDER

Amwest Surety Insurance Company filed suit against Frank Szabo and Szabo Construction Services, Inc. ("SCSI") to recover funds and collect collateral pursuant to a General Indemnity Agreement (the "Indemnity Agreement") and an Agreement/Loan/Trust Account (the "Execution Agreement") for expenses it incurred and for protection against expenses it might incur as a result of issuing surety bonds for Szabo Contracting, Inc. On October 11, 2001, this Court granted Amwest's Motion for Summary Judgment as to Szabo's individual liability under the Indemnity Agreement and ruled that the Execution Agreement was enforceable against both Szabo and SCSI. *Amwest Surety Ins. Co. v. Szabo*, No. 00 C 2716, 2001 WL 1230643, at *4-5 (N.D. Ill. Oct. 11, 2001).

Amwest now moves for summary judgment against SCSI as to the enforceability and scope of a certain provision of the Execution Agreement. Specifically, Amwest seeks to have SCSI sign documents to secure Amwest for losses and expenses that it incurred while completing certain construction projects using SCSI and to hold SCSI liable for all demands, liabilities,

losses, costs, damages, attorney's fees, and expenses, of whatever kind or nature, incurred by Amwest in connection with the completion of the projects.

I. **Background**[1]

Amwest, a company incorporated in Nebraska, provides surety bonds to contractors and other companies. In 1999, Amwest issued surety bonds on behalf of Szabo Contracting, an Illinois corporation, to secure Szabo Contracting's obligation to perform construction work for various public bodies. Szabo Contracting was the principal under the bonds, and the various public bodies funding the construction work were the obligees. In consideration of the issuance of the bonds by Amwest, Szabo Contracting and Amwest entered into an Indemnity Agreement on April 6, 1999.

In October 1999, the weight of Szabo Contracting's debts became too much for it to bear, and, as a result, Szabo Contracting made an assignment for the benefit of creditors. By reason of that assignment, and because of its financial condition, Szabo Contracting advised Amwest and other concerned parties that Szabo Contracting would be unable to perform its obligations under the construction contracts, thereby placing Szabo Contracting in default of those obligations. On December 20, 1999, an involuntary bankruptcy proceeding was initiated against Szabo Contracting, and an order of relief was entered by the Bankruptcy Court of the Northern District of Illinois, Eastern Division, on January 14, 2000.

Around the time of the October 1999 assignment, Szabo formed SCSI. As president of this new entity, Szabo proposed to Amwest that SCSI complete the construction work started by

---

[1] The following facts are undisputed.

Szabo Contracting. Discussions led to Amwest accepting Szabo's proposition and to the signing of an Execution Agreement by Szabo, SCSI, and Amwest. The Execution Agreement, dated October 15, 1999, stated that Szabo, as president of SCSI and in his individual capacity, acknowledged and affirmed the obligations undertaken by him and Szabo Contracting pursuant to the Indemnity Agreement. The Execution Agreement also declared that by executing the Execution Agreement, Szabo and SCSI each agreed to "execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects." (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 3.)

This new endeavor was short-lived. SCSI commenced performance on the construction projects, but its forces were soon demobilized amidst disputes with Amwest over billing and payment under a separate contract. Before demobilizing, however, SCSI asserted liens against public funds for three of the bonded projects. Amwest again found itself in the position of arranging for the completion of the construction contracts.

Amwest determined that it would need to expend more funds than it was to receive from the obligees to complete the construction contracts. Therefore, around April 2000, Amwest made demand of Szabo and SCSI under the Indemnity Agreement and Execution Agreement to pay Amwest the amounts it had incurred in losses thus far and to post collateral to protect Amwest against potential claims. Both Szabo and SCSI refused to capitulate to the demand, so Amwest filed a complaint in federal court.

Amwest's original complaint contained three counts: breach of the Indemnity Agreement and Execution Agreement, specific performance of the collateral posting provision of the

Indemnity Agreement, and breach of a separate contract that required SCSI to complete the remaining construction work at IDOT Force Account rates. The complaint sought pecuniary damages, the posting of collateral, and the release of liens. Amwest moved this Court for summary judgment as to liability on all three counts of the complaint.

On October 11, 2001, this Court issued a Memorandum Opinion and Order granting in part and denying in part Amwest's Motion for Summary Judgment. This Court refused to grant summary judgment on counts two and three of Amwest's complaint. Neither count two nor count three had been adequately addressed and argued by Amwest in the briefs. *Amwest Surety Ins. Co.*, 2001 WL 1230643, at *8. With regard to count one, this Court ruled that the Execution Agreement was enforceable against both Szabo and SCSI, and that Szabo was individually liable under the Indemnity Agreement. *Id.* at *4-5. This Court rejected Amwest's argument that SCSI was a successor or joint venture of Szabo Contracting. *Id.* at *5-6.

This Court did not determine the nature of what SCSI's and Szabo's obligations were under the Execution Agreement. The Execution Agreement made no immediate demands of Szabo or SCSI, but the agreement did require Szabo and SCSI to "execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects." (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 3.) In a footnote, this Court made clear that "nothing in this decision should be construed as a finding as to the scope or enforceability of this obligation." *Amwest Surety Ins. Co.*, 2001 WL 1230643, at *5 n.5.

Following the October 11, 2001 decision, Amwest began to demand that SCSI execute documents necessary to secure Amwest for the loss and expense it incurred in completing the construction projects. Around October 15, 2001, Amwest asked SCSI to sign a General Indemnity Agreement (the "GIA").[2] (Pl.'s Rule 56.1 Statement of Material Facts Ex. K.) SCSI refused. On October 31, 2001, Amwest again asked SCSI to sign the GIA, and also requested that SCSI sign an Assignment Agreement. The Assignment Agreement served to transfer to Amwest all of SCSI's rights to the liens against the public funds. (Pl.'s Rule 56.1 Statement of Material Facts Ex. L at 2-3.) Around November 12, 2001, SCSI refused to sign both the GIA and the Assignment Agreement. Shortly thereafter, Amwest filed the instant Motion for Summary Judgment, in which Amwest asks this Court to enforce the Execution Agreement against SCSI by requiring SCSI to sign the GIA and Assignment Agreement.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact that may affect the outcome of a claim under the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue as to a material fact exists if, construing all of the facts in the light most favorable to the

---

[2] The GIA is a copy of the Indemnity Agreement; the two documents are identical. We refer to the document under two different names in this decision to avoid confusion.

nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990).

### B. SCSI's Obligation to Secure Pursuant to the Execution Agreement

In our previous opinion, we noted that two provisions of the Execution Agreement did not actually obligate SCSI to do an affirmative act at the time the agreement was executed. *Amwest Surety Ins. Co.*, 2001 WL 1230643, at *4-5. Uncertain as to the scope and enforceability of SCSI's obligation "to execute any and all documents necessary to secure Amwest," we left it an open question to allow the parties an opportunity to brief the issue. After consideration, this Court finds that SCSI's obligation "to execute any and all documents necessary to secure Amwest" is definite and certain, and thus enforceable.

A contract is enforceable under Illinois law only if the essential terms are definite and certain. *Academy Chi. Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991). The essential terms of a contract are definite and certain if a court can determine the obligations of the parties and whether or not a breach has occurred. *Wilson v. Wilson*, 46 F.3d 660, 667 (7th Cir. 1995) (quoting *Academy Chi. Publishers*, 578 N.E.2d at 983); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987); Restatement (Second) of Contracts § 33(2) (1981). In making these determinations, courts consult the language and provisions of the contract "under proper rules of construction and applicable principles of equity." *Midland Hotel Corp.*, 515 N.E.2d at 65; *accord United States v. Orr Constr. Co.*, 560 F.2d 765, 769 (7th Cir.

1977). "If the language of the contract is too indefinite to permit th[ese] determination[s] the court cannot enforce the contract without engaging in the forbidden practice of itself supplying the terms of the agreement . . . ." *Orr Constr. Co.*, 560 F.2d at 769.

The Execution Agreement states that SCSI agrees "to execute any and all documents necessary to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects." (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 3.) Admittedly, "secure," as an isolated term, has many different meanings (providing insurance, issuing bonds, executing guarantees, etc.). But we find that the terms and conditions of the Execution Agreement, when read as a whole, provide secure with a definite and certain meaning—indemnify. *See First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) ("Words and phrases cannot be considered in isolation; rather, the court must consider the contract as a whole to provide each provision with the meaning intended by the parties."); *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000) (same).

The three sentences immediately preceding SCSI's agreement to secure Amwest shed light on the parties' agreed upon definition of secure. In these sentences SCSI acknowledges the existence of the Indemnity Agreement, confirms receipt of a copy of the Indemnity Agreement, and, more importantly, affirms the terms and conditions of the Indemnity Agreement. (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 2-3.) Having acknowledged, received, and affirmed the terms and conditions of the Indemnity Agreement, it follows that SCSI actually agrees to indemnify Amwest by agreeing to secure Amwest for all loss and expense it may incur in

completion of the contracts using SCSI. (*Id.* at 3.) Indeed, based on the plain language and structure of the preceding sentences, it would be unreasonable to attach any other meaning to the word "secure."

This definition of secure not only expresses the intent of the parties, but also resonates with the factual setting of the case. The factual setting of the case can be a valuable tool when a court analyzes a contract. *Medcom Holding Co. v. Baxter Travenol Labs. Inc.*, No. 87 C 9853, 1998 WL 704098, at *6 (N.D. Ill. Sept. 30, 1998). Here, this tool is not necessary for showing that SCSI obligated itself to indemnify Amwest, but it helps to complete the picture and confirm our analysis. Indemnification agreements are commonplace in the construction industry and Amwest had already obtained one to secure the projects at issue. When Amwest and SCSI's president signed the Execution Agreement the parties were in the midst of financial difficulties and construction stoppages. Predicating the renewal and continuation of work on SCSI's commitment to indemnify Amwest would seem to be a given. In fact, it would defy common sense to find to the contrary.

We find that SCSI's agreement "to execute any and all documents necessary to [indemnify/secure] Amwest"—i.e., the scope of SCSI's obligation to indemnify—includes, at the very least, the Indemnity Agreement. When SCSI agreed to indemnify/secure Amwest, SCSI was simultaneously acknowledging the execution of the Indemnity Agreement—a copy of which it received—and affirming the obligations contained in the Indemnity Agreement. (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 2-3.) SCSI's acknowledgment and affirmation of the Indemnity Agreement enable this Court to ascertain the type of indemnification to which Amwest

and SCSI agreed.[3] *See Amerihost Props., Inc. v. Puissant Group, Inc.*, No. 96 C 1910, 1998 WL 26154, at *4 (N.D. Ill. Jan. 14, 1998) ("Although the paperwork to be completed is not enumerated, the provision sufficiently describes the parties' respective obligations, allowing the parties and the Court to readily identify the parties' respective obligations."); *Turner Constr. Co. v. Midwest Curtainwalls, Inc.*, 543 N.E.2d 249, 251 (Ill. App. Ct. 1989) ("Generally, one instrument may incorporate another instrument by reference. The [instrument] must show an intent to incorporate the other [instrument] and make it part of the [instrument] itself."); *cf. Lencioni v. Brill*, 365 N.E.2d 1169, 1171-72 (Ill. App. Ct. 1977) (holding that an agreement to transfer real property following the execution of a "standard form mortgage" was unenforceable because the court could not ascertain the terms and conditions of a "standard form mortgage").

Further support for this construction comes from the repeated references to the terms and conditions of the Indemnity Agreement throughout the Execution Agreement. On the second page of the Execution Agreement, for example, Amwest agrees to deposit funds in a trust account for advancement to SCSI "in accordance with the terms and conditions of . . . [the Indemnity Agreement]." (Pl.'s Rule 56.1 Statement of Material Facts Ex. G at 3.) We cannot discern why the parties would have included this provision in the Execution Agreement if they did not intend for SCSI to be bound by the terms and conditions of the Indemnity Agreement. Similarly, on the fourth page of the Execution Agreement, in the event Amwest loans funds to the trust account, SCSI agrees that such amounts are presumed to be a loss for which SCSI is

---

[3] We note that one of the definitions of "affirm" is "ratify." Black's Law Dictionary 59 (6th ed. 1990). While Amwest never makes this argument, SCSI's affirmation of the terms and conditions of the Indemnity Agreement can be interpreted as a ratification of the terms and conditions of the Indemnity Agreement, perhaps constituting a basis for binding SCSI.

"obligated to indemnify Amwest in accordance with the terms of the [Indemnity Agreement]." (*Id.* at 5.) This provision assumes that SCSI agreed to the terms of the Indemnity Agreement. Finally, on the last page of the Execution Agreement, the parties make clear that none of the provisions in the Execution Agreement should be construed to interfere with the enforceability of the Indemnity Agreement: "The terms and conditions of the [Indemnity Agreement] shall remain [in] full force [and] effect." (*Id.* at 6.)

Accordingly, we reject SCSI's assertion that "[i]t is impossible from reading [the provision outlining SCSI's obligation to indemnify/secure Amwest], even in the context of the Execution Agreement as a whole, to determine what documents the parties had in mind." (Def.'s Mem. Resp. Pl.'s Mot. Summ. J. at 6.) Based on the plain language and structure of the provisions preceding the one at issue, and considering the Execution Agreement as a whole, it is possible to determine SCSI's obligation to indemnify/secure Amwest and whether or not a breach has occurred. *Cf. Orr Constr. Co.*, 560 F.2d at 770 (finding that an agreement was unenforceable where the plain language of the agreement shed no light on what the parties intended). Otherwise put, SCSI's obligation to indemnify/secure Amwest is definite and certain, and thus enforceable.

The final point of contention between the parties concerns the Assignment Agreement. Amwest argues that SCSI's obligation to execute the Assignment Agreement derives from the language of the Execution Agreement. (Pl.'s Mot. Summ. J. at 8.) We agree. More specifically, SCSI's obligation to execute the Assignment Agreement derives from the terms and conditions of the Indemnity Agreement, of which SCSI agreed to be bound as a result of signing the Execution Agreement. Under paragraph six of the Indemnity Agreement, SCSI obligated itself to assign to

- 10 -

Amwest the following: "all rights in connection with any Contract" and subcontracts; "[a]ny and all sums due or which may thereafter become due under any Contract"; and "[a]ll rights arising out of insurance policies, notes and accounts receivable, and choses in action." (Pl.'s Rule 56.1 Statement of Material Facts Ex. K at 3.) We conclude that this provision requires SCSI to assign to Amwest the liens held by SCSI against the public funds.

### III. Conclusion

This Court finds that SCSI's obligation "to secure Amwest for all loss and expense it may incur in completion of the contracts using [SCSI], and for all monies paid to third parties as well as [SCSI] in connection with the completion of the projects" is definite and certain, and thus enforceable. SCSI's agreement to secure Amwest is properly read as an agreement to indemnify Amwest. The terms and conditions of SCSI's agreement to indemnify are contained in the Indemnity Agreement, which SCSI agreed to sign by signing the Execution Agreement. Accordingly, Amwest's Motion for Summary Judgment is granted.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

**Dated:** July 15, 2002.

- 11 -

Copies have been mailed to:

| | |
|---|---|
| T. SCOTT LEO, Esq. | JAMES M. DASH, Esq. |
| RAKESH KHANNA, Esq. | MARY K. DANNA, Esq. |
| The Law Offices of Leo & Weber | Much Shelist Freed Denenberg |
| One North LaSalle Street |   Ament Bell & Rubenstein, P.C. |
| Suite 3600 | 200 North LaSalle Street |
| Chicago, IL  60602 | Suite 2100 |
| | Chicago, IL  60601-1095 |
| Attorneys for Plaintiff | Attorneys for Defendants |